**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Shatosha Anderson, | |
| Plaintiff, | |
| | Case No. 1:23-cv-04097 |
| v. | |
| | Judge Mary M. Rowland |
| Illinois Department of Employment Security, | |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Shatosa[1] Anderson ("Anderson") brings this action against Defendant Illinois Department of Employment Security ("IDES") for retaliating against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.* ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. 621 *et seq.* (the "ADEA"). IDES has moved for summary judgement on all claims. For the reasons stated below, IDES' motion for summary judgment [56] is granted.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

[1] The correct spelling of Anderson's first name is "Shatosha." [65-1].

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*.

## BACKGROUND

### A. Factual Background[2]

Anderson has been employed as an Auditor II with IDES since before 2021. [58] ¶ 2. As an Auditor II, Anderson is responsible for conducting audits on Illinois

---

[2]The facts are taken from IDES' Rule 56.1 statement [58] and are undisputed unless otherwise noted.

employers that are assigned to her. *Id*. ¶ 3. Anderson reports to audit field manager Nick Frega ("Frega"). *Id*. ¶ 7. Frega's primary duty is to supervise the auditors on his team and assign those auditors audits as he receives them. *Id*. Frega's supervisor is Alexander Hogdahl ("Hogdahl"). *Id*. ¶ 9. Hogdahl oversees the audit program for IDES, supervises IDES field audit managers, and sets policies designed to ensure that IDES can meet audit goals set by the Department of Labor. *Id*. Anderson is part of IDES' unionized workforce ("Union"), and thus the terms and conditions of her employment are covered by a collective bargaining agreement ("CBA"). *Id*. ¶¶ 2, 14.

IDES requires Auditor IIs to meet three quantitative standard objectives: (1) complete 76 audits per year (19 per quarter), (2) complete 95% of their assigned audits within 120 days, and (3) have 10% or less of their submitted audits returned to them for corrections. *Id*. ¶ 6. Though the parties disagree on whether these quantitative standard objectives were properly promulgated under the CBA and whether employees could be disciplined for failing to meet these objectives, [64] ¶ 6, it is undisputed that the objectives are measured at the end of an employee's 12-month evaluation period, which commences on the anniversary of each employee's date of hire. [58] ¶ 6. As a result, not all Auditor IIs have the same annual evaluation period. *Id*. Before 2025, Anderson's annual review period ran from June 1 through May 31. *Id*. ¶ 26.

If an Auditor II fails to meet their performance objectives, their supervisor can initiate a corrective action plan ("CAP"). *Id*. ¶ 10. The CAP is implemented to assist an employee and is not meant to be punitive. *Id*. In addition, a supervisor can utilize

quarterly evaluations with an auditor struggling with performance issues before and/or during a CAP time period. *Id*. If after a CAP, or after poor quarterly or annual evaluations, an auditor's work performance does not improve, the supervisor can refer the auditor to IDES' Labor Relations Department ("Labor Relations") for discipline. *Id*. ¶¶ 11, 18.

Upon receiving a referral, Labor Relations, if warranted, opens a case and commences its own investigation. *Id*. ¶ 18. This includes collecting relevant documents, such as performance documents or time sheets, and conducting a pre-disciplinary meeting with a member of Labor Relations, the manager or supervisor of the auditor, the auditor, and a Union representative. *Id*. ¶¶ 18–19. Labor Relations then presents the case to Laron Cole ("Cole"), the Chief Labor Relations Manager for IDES. *Id*. ¶¶ 17, 19. Cole thereafter evaluates based on the facts before him whether discipline is warranted. *Id*. ¶¶ 19–20.

On May 19, 2021, Anderson filed with the Equal Employment Opportunity Commission (the "EEOC") a charge of discrimination against IDES (the "May 2021 EEOC Charge") alleging discrimination based on race, age, sex, and retaliation for engaging in protected activity. *Id*. ¶ 22. On July 19, 2021, the EEOC dismissed Anderson's charge and issued a Notice of Right to Sue letter. *Id*. ¶ 23. No response to the May 2021 EEOC Charge was ever required from IDES. *Id*.

Anderson did not meet the three quantitative standard objectives in her 2021 annual evaluation. *Id*. ¶27. As a result, Frega placed Anderson on a 90-day CAP that commenced on July 14, 2021, *id*. ¶¶ 28, 29, and in October 2021 instituted quarterly,

rather annual, performance reviews. *Id.* ¶ 31. Despite the monitoring and CAP, Anderson failed to meet any of the three quantitative standard objectives for Auditor IIs during her 2022 annual evaluation period. *Id.* ¶ 32.

Around September of 2022, Frega and Hogdahl referred Anderson to Labor Relations for discipline related to her poor performance. *Id.* ¶ 34. Labor Relations held a pre-disciplinary meeting with Anderson, her Union representative, and Frega on October 28, 2022. *Id.* ¶ 35. Anderson submitted a written rebuttal to the charges against her. *Id.* ¶ 36. After reviewing all the information presented, Cole determined that the referral to him for discipline was warranted. *Id.* IDES thereafter issued discipline to Anderson in the form of a one-day suspension without pay that commenced on November 29, 2022 (the "November 2022 Suspension"). *Id.* ¶ 38. At the time of this suspension, neither Cole, Frega, nor Hogdahl knew that Anderson had filed her May 2021 EEOC Charge. *Id.* ¶¶ 24, 37.

Anderson failed again to meet her performance objectives in the December 2022 to February 2023 quarter. *Id.* ¶ 49. As a result, on March 2, 2023, Frega and Hogdahl again referred Anderson to Labor Relations for discipline *Id.* ¶ 45.

Four days later, on March 6, 2023, Anderson filed a second charge with the EEOC (the "March 2023 EEOC Charge") alleging that her November 2022 Suspension was discriminatory and in retaliation for engaging in protected activity. *Id.* ¶ 40. IDES, through its Employment Opportunity ("EO") Officer, was notified of the March 2023 EEOC Charge on March 9, 2023. *Id.* Hogdahl was informed of the March 2023 EEOC Charge that same day, and Cole was made aware of the March 2023 EEOC Charge

the next day. *Id*. ¶¶ 41, 42. Frega, however, did not learn of the March 2023 EEOC Charge until the winter of 2024. *Id*. ¶ 43.

Following the March 2, 2023 referral of Anderson for possible discipline, a pre-disciplinary meeting was held on March 27, 2023, at which Anderson, her Union representative, and Frega were present. *Id*. ¶ 46. Anderson submitted a written rebuttal to the charges against her, to which Frega responded. *Id*. After reviewing all the information presented, Cole determined that a five-day suspension without pay was appropriate. *Id*. ¶ 47. IDES thereafter issued discipline to Anderson in the form of a five-day suspension without pay that commenced on April 20, 2023 (the "April 2023 Suspension"). *Id*. ¶ 48.

Anderson again failed to meet her performance objectives in her June 2023 to August 2023 quarterly review. *Id*. ¶ 50. Instead of another disciplinary action, Labor Relations recommended that Anderson be placed on a second 90-day CAP. *Id*. ¶ 52. The second CAP commenced on September 5, 2023. *Id*.

Despite the second CAP, Anderson did not meet her CAP objectives nor two of the three quantitative standard objectives in her September 2023 to November 2023 quarterly review. *Id*. ¶¶ 67–68. In January 2024, Anderson was again referred to Labor Relations for unsatisfactory work performance. *Id*. ¶ 63. Labor Relations held a pre-disciplinary meeting on January 22, 2024, that Anderson, her Union representative, and Frega attended. *Id*. Anderson submitted a written rebuttal to the charges against her, to which Frega responded. *Id*. ¶ 64. After reviewing all the information presented, Cole determined a ten-day suspension without pay was

6

warranted. *Id*. ¶ 65. IDES thereafter issued discipline to Anderson in the form of a ten-day suspension without pay that commenced on February 14, 2024 (the "February 2024 Suspension"). *Id*. ¶ 66.

Anderson failed to meet any of the three quantitative standard objectives in her December 2023 to February 2024 quarterly review and 2024 annual review, *id*. ¶¶ 70, 73, 79, and two of the three objectives in her March 2024 to May 2024 quarterly review. *Id*. ¶ 72. After Anderson again failed to meet the objectives in her June 2024 to August 2024 quarterly review, Anderson was referred to Labor Relations for unsatisfactory work performance. *Id*. ¶ 75. Labor Relations held a pre-disciplinary meeting on August 22, 2024, at which Anderson, her Union representative, and Frega were present. *Id*. ¶ 76. After a review of all information presented, Cole determined that a twelve-day suspension without pay was warranted. *Id*. ¶¶ 77–78. IDES thereafter issued discipline to Anderson in the form of a twelve-day suspension without pay that commenced on September 30, 2024 (the "September 2024 Suspension"). *Id*. ¶ 78.

## B. Procedural Background

Anderson filed her original complaint in this matter on June 26, 2023. [1]. In response to IDES' motion to dismiss the original complaint [9], Anderson filed her operative First Amended Complaint on October 5, 2023. [14]. The First Amended Complaint alleges age discrimination in violation of the ADEA (Count I), retaliation for filing EEOC charges in violation of the ADEA (Count II), race discrimination in violation of Title VII (Count III), gender discrimination in violation of Title VII (Count

IV), and retaliation for filing EEOC charges in violation of Title VII (Count V). *Id.* ¶¶ 22–55. The First Amended Complaint identifies only the November 2022 and April 2023 Suspensions as a basis for Anderson's retaliation claims. *Id.* ¶¶ 12, 16, 30, 50, 52.

On November 9, 2023, IDES moved to dismiss all counts in the First Amended Complaint for failure to state a claim under Rule 12(b)(6), and in the alternative, to dismiss the retaliation claims under Rule 12(c) for failure to exhaust. [20]. This Court partially granted IDES' motion on September 10, 2024, dismissing Anderson's discrimination claims (Counts I, III, and IV) but allowing her retaliation claims to proceed (Counts II and V). [27] [28].

Fact discovery closed on May 16, 2025. [45]. Six days later, Anderson filed a motion to reopen discovery and compel IDES to produce certain documents, including the unredacted names of Auditor IIs supervised by Hogdahl as well as quality and timeliness metrics for those Auditor IIs on a quarterly and annual basis. [46] at 6. Anderson maintained in her motion to compel that Hogdahl was the ultimate "decision maker" regarding her suspensions, so consequently all the Auditor II's under his supervision were similarly situated individuals for purposes of a comparison analysis. *Id.*

On May 22, 2025, the Court denied Anderson's motion to compel as to the quality and timeliness metrics. [47]. The Court, however, allowed the parties to submit information for the Court to determine whether Hogdahl was indeed the ultimate decision-maker with respect to Anderson's discipline. *Id.*

On June 20, 2025, the parties submitted a status report with relevant deposition transcripts attached. [49] [50] [51] [52]. Upon reviewing the transcripts provided, the Court was unable to find evidence that the ultimate decision to refer Anderson to Labor Relations for discipline was Hoghdal's alone. [55] at 3. Instead, it appeared to have been a mutual decision between both Hoghdal *and* Frega. *Id.* For this reason, the Court denied Anderson's motion to compel the redacted names of all Auditor IIs under Hoghdal's supervision, agreeing with IDES that appropriate comparators are Auditor IIs that also have Frega as their supervisor. *Id.*

On July 18, 2025, IDES moved for summary judgment on Anderson's remaining claims. [56].

## ANALYSIS

To survive summary judgment on a retaliation claim under Title VII or the ADEA[3], a plaintiff must produce evidence from which a reasonable juror could find that (1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) there was a causal connection between the two. *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 891 (7th Cir. 2024). The evidence presented must be considered "as a whole" to determine if a causal link exists. *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "Ultimately, the inquiry comes down to one question: 'Does the record contain sufficient evidence to permit a

---

[3]The analysis for retaliation claims under Title VII and the ADEA is the same. *Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 801 (N.D. Ill. 2014) (citing cases).

reasonable fact finder to conclude that retaliatory motive caused' the materially adverse action?" *Id.* (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

IDES does not dispute the first two elements of Anderson's retaliation claims. [57] at 7. IDES instead focuses on causation, contending that Anderson cannot show any causal link between her EEOC charge filings (the "protected activities") and any of her suspensions (the "adverse actions"). *Id.* IDES maintains that the overwhelming evidence shows that it was Anderson's poor performance that led to her suspensions. *Id.* at 7–11. Anderson does not dispute that she continually failed to meet her performance goals from 2021 through her 2024 suspensions. [64] ¶ 27 (annual review ending in May 2021); ¶ 32 (annual review ending in May 2022); ¶ 39 (quarter ending in August 2022); ¶ 49 (quarter ending in February 2023); ¶ 50 (quarter ending August 2023); ¶ 51 (quarter ending November 2023); ¶ 70 (quarter ending in February 2024); ¶ 72 (quarter ending in May 2024); ¶ 73 (annual review ending in May 2024); and ¶ 75 (quarter ending August 2024). Anderson instead spotlights other evidence she believes permits a reasonable inference that she was suspended due to her EEOC charge filings. As will be explained below, the Court disagrees that Anderson's proffered evidence, individually or as a whole, supports a reasonable inference of a retaliatory motive by IDES.

Before proceeding, however, the Court addresses upfront an important and potentially dispositive point. The operative First Amended Complaint only contains allegations related to Anderson's November 2022 and April 2023 Suspensions. [14].

10

Anderson's February and September 2024 Suspensions are not mentioned. On summary judgment, Anderson cannot add new factual bases to support her retaliation claims that were not presented in her complaint. *Whitaker v. Milwaukee Cty., Wisc.*, 732 F.3d 802, 808 (7th Cir. 2014). Because Anderson only opposes summary judgment on her February 2024 and September 2024 Suspensions, [66] at 9–13, summary judgment appears[4] appropriate based on Anderson's non-opposition alone.

Nevertheless, because the parties included the February and September 2024 Suspensions within the scope of their discovery and summary judgment briefing, and because deciding summary judgment on the February and September 2024 Suspensions will inform whether amendment to Anderson's First Amendment Complaint would be futile, the Court addresses those suspensions in its analysis.

## I.     Deviation from Policy

Anderson first posits that IDES' failure to follow its own policies gives rise to an inference that her EEOC charges were a motivating factor for her suspensions. [66] at 10. "Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of unlawful intent." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (citing *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012). An employer, however, is not

---

[4]Even though Anderson does not oppose summary judgment based on her November 2022 and April 2023 Suspensions, the Court recognizes that IDES, as the movant, still must show that it is entitled to summary judgment given the undisputed facts. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).

required to "rigidly adhere to procedural guidelines in order to avoid an inference of retaliation." *Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012). Instead, "we look for pretext in the form of 'a dishonest explanation, a lie rather than an oddity or an error.'" *Id.* (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000)). "[W]hen independent surrounding circumstances indicate that the employee's performance was seriously deficient and worthy of disciplinary action, a procedural abnormality will not suffice to establish a retaliatory motive." *Id.*

Anderson points to two policies that IDES purportedly deviated from. The first is a requirement in the CBA and IDES' Procedures Manual related to "reasonable workload standards." [65-3]; [65-1] at Ex. A. Both documents state that "where such standards of productivity measurements exist, they shall be reduced in writing, with copies to the employees and the Union." *Id.* The creation of or any changes to such standards, the documents explain, must be "discussed with the Union prior to implementation." *Id.* Anderson maintains that IDES never had a written workload standard that was discussed with and sent to the Union. [65-1] ¶ 5. As a result, Anderson argues, IDES was never permitted, under its policies, to take disciplinary actions against her for failing to meet workload standards. *Id.*; [66] at 10. IDES contests this, asserting that it was not required to obtain Union authorization for the three quantitative standard objectives that Anderson continually failed to meet. [68-1] ¶¶ 6–7.

While there is certainly a factual dispute as to whether the three quantitative standard objectives are considered "reasonable workload standards" under the CBA

and IDES' Procedures Manual, the Court agrees with IDES: why is this relevant? Even if the authorization process required by the CBA and Procedures Manual were applicable here, Anderson fails to explain why failing to follow that process leads to an inference that IDES suspended her in retaliation for her filing EEOC charges. *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015) ("Smith hasn't explained why these [procedural] infirmities … support an inference of discriminatory intent."). The procedural deviation she presents—failing to negotiate with the Union and issue workload standards in writing—would affect every Auditor II at IDES equally. In other words, even if the three quantitative standard objectives were improperly issued, they were uniformly improper, as Anderson admits that all Auditor IIs were subject to these same objectives. [64] ¶ 6. Anderson provides no evidence that she was somehow singled out under these purportedly improperly promulgated objectives. A procedural violation that uniformly affects all Auditor IIs, without anything more, is not enough to permit a reasonable jury to infer any retaliatory intent by IDES. *See Walker v. Abbott Laboratories*, 416 F.3d 641, 644 (7th Cir.2005) ("A plaintiff cannot be permitted to manufacture a case merely by showing that the employer does not follow its employment rules with Prussian rigidity.").

Anderson also points to the CBA's requirement related to employee absences. [65-1] ¶ 45; [65-4]. Specifically, the CBA provides that "an employee's authorized absence shall not be detrimental in any way to the employee's record, nor will the employee be disciplined or counseled for work unable to be completed based on the employee's authorized absence." [65-4]. Anderson maintains that under this policy, she was not

permitted to be disciplined for work that she was unable to complete during leave. [66] at 10. Anderson contends that, despite this policy, IDES considered employer-contact gaps[5] that occurred when she was on leave. [65] ¶ 22. IDES counters that it appropriately considers leave when issuing discipline. [68-1] ¶ 9.

Again, while there is a factual dispute as to whether IDES appropriately considered Anderson's leave when determining the number of employer-contact gaps, Anderson fails to explain how one can infer from this that IDES suspended her in retaliation for her filing EEOC charges. *Smith*, 806 F.3d at 907 Even if IDES mistakenly calculated one of various factors when deciding to suspend her, Anderson offers no evidence to suggest that IDES lied about the number of her employer-contact gaps. And Anderson openly admits that she did not meet the other, non-employer-contact objectives (*i.e.*, the three quantitative standard objectives) that led to her suspensions. *Id*. ¶¶ 38-39, 48-49, 67-68, 74, 78-79. Because the "independent surrounding circumstances indicate that [Anderson's] performance was seriously deficient and worthy of disciplinary action" a "procedural abnormality will not suffice to establish a retaliatory motive." *Kidwell*, 679 F.3d at 969.

## II.    More Favorable Treatment of Similarly Situated Individuals

Anderson next points to purported evidence that other Auditor II's were treated more favorably than her. [66] at 12. Evidence that a similarly situated employee who did not engage in protected conduct was treated differently can create an inference of

---

[5]In addition to the three quantitative standard objectives, IDES requires auditors to contact employers under audit every 15 business days while an audit is active. [58] ¶ 48.

retaliatory intent. *Lesiv*, 39 F.4th at 918. Although proper comparators need not be identically positioned, "similarly situated employees must be 'directly comparable' to the plaintiff 'in all material respects.'" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). "In a case challenging disciplinary action, the plaintiff and comparator ordinarily must have dealt with the same supervisor, been subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Lesiv*, 39 F.4th at 919 (cleaned up).

Anderson's assertions on this point are a rehash of the arguments she presented on her motion to compel. [66] at n.1. As noted, in denying that motion, this Court explained that the record did not provide evidence that the ultimate decision to refer Anderson to Labor Relations was Hogdahl's alone [55] at 3. The evidence instead showed that it was a mutual decision between both Frega and Hoghdal. *Id.*

Anderson provides no new evidence warranting reconsideration of this Court's previous determination. The facts still demonstrate that Frega was Anderson's direct supervisor and was intimately involved in her review and disciplinary processes. [64] ¶¶ 7, 12, 13, 27–31, 34–35, 45–46, 50–52, 54–58, 62–64, 69, 75, 76. The relevant comparators, therefore, would be Auditor II's that were under Frega's supervision. Yet Anderson has not pointed to any specific Auditor II under Frega's supervision that was treated more favorably than her.

15

Even if the Court expanded the universe of similarly situated employees to all Auditor IIs, Anderson's evidence is lacking. Anderson relies exclusively on spreadsheets indicating that certain Auditor IIs completed fewer than 19 quarterly or 76 annual audits, and often considerably less audits than her. [65] ¶¶ 12–14 (citing [52]). But quarterly comparisons across Auditor IIs in the spreadsheets are meaningless because annual completion totals are what drive performance reviews. [64] ¶ 59. And annual comparisons across Auditor IIs in the spreadsheets are similarly flawed as review periods are staggered by start date, and Anderson provides no evidence that any of the auditors in the spreadsheets shared her start date. *Id*. ¶ 6. Moreover, the spreadsheets only show variances in one of the three quantitative standard objectives on which Anderson was reviewed—the number of audits completed. [52]. Anderson provides no evidence that the Auditor IIs in the spreadsheets also failed to meet the other two quantitative standard objectives that Anderson repeatedly failed to meet.

In sum, without a valid comparator, no reasonable jury could infer that a retaliatory motive caused Anderson's suspensions.

## III. Suspicious Timing

Anderson lastly asserts that the suspicious timing between her EEOC charges and suspensions creates an inference of retaliatory intent. [66] at 11. "Temporal proximity between protected activity and an adverse employment action can support an inference of causation between the two." *Jokich v. Rush Univ. Med. Cent*., 42 F.4th 626, 634 (7th Cir. 2022). "Suspicious timing alone, however, is generally insufficient

to establish a retaliatory motivation." *Id*. "[F]or a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff must show that the person who decided to impose the adverse action knew of the protected conduct.'" *Kidwell*, 679 F.3d at 966 (citing *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir.2001)).

Anderson was first suspended in November 2022. The only EEOC charge that occurred before that suspension was her May 2021 EEOC Charge. But IDES employees involved in Anderson's discipline—Frega, Hogdahl, and Cole—had no knowledge of the May 2021 EEOC Charge before the November 2022 Suspension. [64] ¶¶ 24, 37. Without such knowledge, no reasonable jury can infer retaliatory intent. *Lesiv*, 39 F.4th at 915 ("Knowledge of the protected activity is necessary to show causation for a retaliation claim.").

Anderson's next suspension occurred in April 2023. Her May 2021 and March 2023 EEOC Charges both occurred before that suspension. The nearly two-year gap between Anderson's May 2021 EEOC Charge and the April 2023 Suspension is too attenuated to infer any retaliatory intent. *Igasaki*, 988 F.3d at 959 ("[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action.") (citing *Kidwell*, 679 F.3d at 966). The March 2023 EEOC Charge is certainly temporally closer to the April 2023 Suspension. But Frega had no knowledge of the March 2023 EEOC Charge before the April 2023 Suspension. [58] ¶

43. And although Hogdahl and Cole knew of the charge, the disciplinary proceedings underlying the April 2023 Suspension were initiated *prior to* the filing of the March 2023 EEOC Charge. *Id.* ¶¶ 40, 45. Given this timing, no reasonable jury could find that Anderson's March 2023 EEOC Charge was the "but for" cause of her April 2023 Suspension. *See Howell v. Bd. of Trs. of Univ. of Illinois*, No. 00 C 3402, 2001 WL 740513, at *6 (N.D. Ill. June 28, 2001) (finding no casual connection where "the disciplinary proceedings leading to the suspension decision began *before* Howell filed her discrimination charges.") (emphasis in the original).

Anderson's final two suspensions occurred in February and September of 2024. Her May 2021 and March 2023 EEOC Charges both occurred before these suspensions. The roughly three-year gaps between the May 2021 EEOC Charge and the February and September 2024 Suspensions are too attenuated for a reasonable jury infer retaliatory intent. *Igasaki*, 988 F.3d at 959. The 11- and 18-month gaps between the March 2023 EEOC Charge and February and September 2024 Suspension are likewise too attenuated. *Id.*

Anderson nevertheless attempts to explain away these large time gaps by claiming that, beginning after the March 2023 EEOC Charge, IDES "sandbagged" her "with a flurry of complex audits to ensure that she would not be able to meet her quantity quota." [66] at 11. Anderson further posits that, once she started to catch up to her workload, IDES forced her "to slow her progress by dictating to her that she only schedule one audit per day" and prevented her "from completing audits that were nearly finished so that she could [not] meet her quotas by forcing her to first work on

18

new, more complex audits." *Id.* at 12. Even if true, the Court agrees with IDES that this would not lead to an inference of retaliatory intent. The supervisor who assigned Anderson audits and who interfaced with her performance goals was Frega. [64] ¶¶ 7, 8; [65-1] ¶¶ 22–24, 27–28, 30, 34, 36. But Frega could not have had a retaliatory intent since he did not learn of Anderson's EEOC charges until the winter of 2024, well after the February and September 2024 Suspensions occurred. [64] ¶ 24; *Lesiv*, 39 F.4th at 915–16 ("A supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place."). And while Anderson attempts to resist this conclusion through self-serving[6] testimony that Hogdahl (who did know of the March 2023 EEOC Charge) directed Frega to mandate that she complete specific audits, [65-1] ¶ 9, missing from this is any indication on when Hogdahl's instructions occurred or the specific audits were assigned. Without such details, the bridge from Hogdahl's ability to tell Frega which audits to assign to Anderson to a scheme by Hogdahl to rig all audits that Frega assigned to Anderson so as to cause Anderson's performance to suffer because she filed the March 2023 EEOC Charge is far too speculative. *Flowers*

---

[6]"Self-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are without factual support in the record." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir.2004) (cleaned up). Additionally, a party cannot "create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir.2012). The notion that Hogdahl could force Frega to assign more complex audits to Anderson is contradicted by Anderson's own statement that it is impossible to know before an audit is undertaken whether it will be complex or simple. [58-3] at 76:1-3 ("So the nature of auditing is that you don't know what type of audit it is until you actually start the audit.").

*v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment.").

In sum, none of the suspensions that Anderson identifies followed close on the heels of her EEOC charges so as to create an inference of retaliatory intent.

## IV. Evidence as a Whole

Stepping back and viewing the evidence as a whole in the light most favorable to Anderson, there are no facts or inferences that would permit a reasonable jury to find that Anderson was suspended in retaliation for her filing EEOC charges. Again, Anderson admits that she continuously failed to meet her performance objectives from 2021 through her 2024 suspensions. [64] ¶¶ 27, 32, 39, 49, 50, 51, 70, 72, 73, 75. This includes specific performance deficiencies underlying her November 2022 Suspension, *id*. ¶¶ 38-39, her April 2023 Suspension, *id*. ¶¶ 48-49, her February 2024 Suspension, *id*. ¶¶ 67-68, and her September 2024 Suspension. *Id*. ¶¶ 74, 78-79. Anderson presents no evidence suggesting any lie behind IDES' determination that these performance failings warranted discipline. Nor can any retaliatory animus be inferred from IDES' alleged deviations from its policies, similarly situated employees who were treated more favorably, or the timing between the EEOC charges and her suspensions. *Supra* §§ I–III.

While the Court acknowledges Anderson's belief that she was treated unfairly by IDES during her disciplinary processes, the legal question that must be addressed "is not whether [IDES'] stated reason was inaccurate or unfair, but whether [IDES] honestly believed the reason it has offered to explain the discharge." *O'Leary v.*

*Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011); *see also Adebiyi*, 98 F.4th at 893 ("it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was ... a lie.") (citation omitted). And here, Anderson has provided no evidence from which a reasonable jury could find that IDES' true motive for suspending her was in retribution for her filing EEOC charges.

## CONCLUSION

For the stated reasons, IDES' motion for summary judgment [56] is granted. The Clerk is directed change the case caption to reflect that Anderson's first name is spelled "Shatosha," enter judgment in IDES' favor and against Anderson, and terminate the case.

E N T E R:

Dated: February 13, 2026

_____
MARY M. ROWLAND
United States District Judge